# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs March 3, 2015

## STATE OF TENNESSEE v. ANTHONY DEWAYNE BLAYLOCK

**Direct Appeal from the Circuit Court for Madison County**
**No. 14-159      Roy B. Morgan, Judge**

**No. W2014-01578-CCA-R3-CD  - Filed April 22, 2015**

A Madison County jury convicted the Defendant, Anthony Dewayne Blaylock, of two counts of aggravated assault, one count of attempted aggravated assault, and one count of criminal trespass, and the trial court sentenced him to an effective sentence of eight years in confinement.  On appeal, the Defendant contends that the evidence is insufficient to sustain his convictions.  After a thorough review of the record and applicable authorities, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined

George Morton Googe, District Public Defender, and Jeremy B. Epperson, Assistant Public Defender, Jackson, Tennessee, for the appellant, Anthony Dewayne Blaylock.

Herbert H. Slatery III, Attorney General and Reporter; Meredith Devault, Senior Counsel; Jerry Woodall, District Attorney General; and Rolf G. Hazelhurst, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

This case arises from the Defendant's interactions with his wife and son on November 29, 2013.  With regard to these events, the Madison County grand jury indicted the Defendant for one count of assault, three counts of aggravated assault, and one count of

aggravated burglary. At the Defendant's trial on these charges, the following evidence was presented: Sharon Elaine Polk testified that she and the Defendant had two children together. She said that before these events she had obtained a "contact order of protection" against the Defendant. This meant that he could contact her and their children, but he could not commit "bodily harm or destroy [her] property." The order of protection was entered into evidence. She said that the Defendant did not live in her home at the time and that he had not lived there for "[p]robably two months or longer" before this incident.

On November 29, 2013, at around 7:20 p.m., the Defendant came to her home, uninvited and without her permission, while she was in her bedroom reading the newspaper. Ms. Polk recalled that she was in her "nightclothes" when she looked up and saw the Defendant standing in her room. Ms. Polk rose, went through her kitchen and into her living room where her fourteen-year-old son, A.B.,[1] was lying on the couch. The Defendant approached her and noted that she was not wearing undergarments under her night gown. She said he attempted to grab her gown, and she tried to get away from him. Ms. Polk recalled that the Defendant tried to hit her, but she "dodged back," so he punched the wall. Ms. Polk felt "scared" by the Defendant's attempt to punch her.

Ms. Polk testified that A.B. stood up from the couch and approached the Defendant. The Defendant grabbed A.B.'s neck and encircled it with his hands. Ms. Polk got away and called the police, and the Defendant and A.B. went outside. Ms. Polk said that, as she called the police, the Defendant left. A.B. came back into the living room from outside, and he was "crying and screaming" and holding his back. A.B. was also "gasping for his breath and . . . throwing up blood." A.B. told her that the Defendant had hit him with a "weight." The police arrived and called an ambulance. Ms. Polk described the weight the Defendant used to hit A.B. as a round weight with a "little hole in it." The weight was outside her home being used to keep the basketball goal in place.

During cross-examination, Ms. Polk testified that this incident occurred on Thanksgiving evening. She said that, before this incident, she and the Defendant had been in a relationship for approximately twenty years. She agreed she had a restraining order against the Defendant but stated that it "allowed contact." She said that the Defendant would come to her home while she was at work and visit with their sons. She had told her sons not to allow him into the residence, but she knew that they still allowed him to enter the home. Ms. Polk said that, during this incident, their other son, who was nine years old at the time, was upstairs in his bedroom.

Ms. Polk agreed that the door to her home was unlocked when the Defendant entered.

---

[1]To protect this minor victim's privacy, we will refer to him by his initials only.

She said that she had two doors to her bedroom, and when she first saw the Defendant in her bedroom, she exited through the other door to get to the kitchen. Ms. Polk said that, before the assault, she noted that the Defendant had been "drinking" and was "angry." He became enraged by her failure to have undergarments under her nightgown. He grabbed her nightgown, she moved away, and he attempted to hit her. She said that the Defendant missed her, and he punched holes in the wall. Ms. Polk described the weight further, saying that it was made out of a piece of brick covered in plastic. She said she did not see the Defendant assault her son with the weight. Ms. Polk recalled that A.B. was treated at the hospital and released a few hours later.

A.B. testified that he was fourteen at the time of trial, and he identified the Defendant as his father. A.B. testified about that evening, saying that all he recalled was his father entering the residence and arguing. He said he also remembered going outside and "getting hit with the weight" by the Defendant. He said he did not recall his father grabbing him around the neck. At this point, the State refreshed A.B.'s memory with a statement he made to police in this case. Thereafter, he agreed that his father pushed him toward a wall by placing his hand around his neck. A.B. said that he went outside, where his father hit him with a weight. He said he was "coughing and stuff," so he went back inside and sat on the floor. A.B. said that it was "burning real bad" when he was coughing and that he could not stop coughing. He agreed he started spitting out blood and that he then threw up. A.B. said that, at the hospital, doctors told him that he would be fine and might have some bruising.

During cross-examination, A.B. testified that he did not know how the Defendant got into the house that evening. He said he did not notice the Defendant until he walked past A.B. while he was lying on the couch. A.B. said that the Defendant came to their home "a lot" when his mother was at work but did not come over when his mother was home. A.B. recalled that the Defendant pushed him with his hands on his neck and then held him against the wall. A.B. then ran outside. The Defendant chased him outside and caught him and then hit him with the weight. A.B. said that the weight that the Defendant hit him with was "small."

James Avery, an officer with the Jackson Police Department, testified that he and another officer responded to the domestic disturbance call for assistance in this case. He said that Ms. Polk called and said that the Defendant had entered her residence without her permission and assaulted her and her son. She said that the Defendant threw a weight at her son's lower back. When they arrived at the residence, Ms. Polk gave the officers a statement consistent with her trial testimony. Officer Avery observed a barbell weight at the residence. He also observed what appeared to be vomit in the living room where A.B. was located. He called emergency services to render aid. Officer Avery said that Ms. Polk was "kind of hysterical" when they arrived. He noted that A.B. was also "crying," saying that his father

3

had thrown a weight and struck him in the back with it.

During cross-examination, Officer Avery testified that he did not take any pictures of the scene. He agreed that Ms. Polk told him that the Defendant had choked her. He agreed that the police report did not indicate that he saw any blood or vomit in the living room. During redirect examination, Officer Avery indicated that he did not write the report but that the other officer who responded completed the report. He stated that the other officer was on military leave and could not be present at trial.

Based upon this evidence, the jury found the Defendant not guilty of assault in Count 1. The jury convicted the Defendant of two counts of aggravated assault, one count of criminal attempt to commit aggravated assault, and one count of criminal trespass. The trial court sentenced him to eight years for each of the assault convictions, and to thirty days for the criminal trespass conviction. It ordered that the sentences be served concurrently, for an effective sentence of eight years of confinement. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to sustain his convictions. When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In the case under submission, the Defendant was convicted of two counts of aggravated assault, one count of attempted aggravated assault, and one count of criminal trespass. The State elected the following facts to support the three counts of aggravated assault:

> Count 2: The alleged act of Assault, by causing fear to Sharon Polk by defendant swinging his fist at her occurring on or about November 30, 2013, in the home of Sharon Polk . . . while [the D]efendant knew he was enjoined or restrained by an Order of Protection.
>
> Count 3: The alleged act of Assault, by causing strangulation or attempted strangulation of [A.B.] by use of [the D]efendant's hands occurring on our about November 30, 2013. . . .

5

Count 4: The alleged act of Assault, by causing fear to [A.B.] by use of a barbell weight by the [D]efendant occurring on or about November 30, 2013. . . .

An assault is defined, as relevant to this case, as:

> (1) Intentionally, knowingly or recklessly causes bodily injury to another; [or]
>
> (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury . . . .

T.C.A. § 39-13-101(a)(1)-(2). Tennessee Code Annotated section 39-13-102, which is the statute codifying aggravated assault, provides:

(a)(1) A person commits aggravated assault who:

> (A) Intentionally or knowingly commits an assault as defined in § 39-13-101, and the assault:
>
> . . .
>
> (iii) Involved the use or display of a deadly weapon; or
>
> (iv) Was intended to cause bodily injury to another by strangulation or bodily injury by strangulation was attempted; or
>
> . . .

(2) For purposes of subdivision (a)(1)(A)(iv) "strangulation" means intentionally impeding normal breathing or circulation of the blood by applying pressure to the throat or neck or by blocking the nose and mouth of another person.

. . .

(c) A person commits aggravated assault who, after having been enjoined or restrained by an order, diversion or probation agreement of a court of

competent jurisdiction from in any way causing or attempting to cause bodily injury or in any way committing or attempting to commit an assault against an individual or individuals, intentionally or knowingly attempts to cause or causes bodily injury or commits or attempts to commit an assault against the individual or individuals.

In Count 2, the Defendant was convicted for the aggravated assault of Ms. Polk based upon his assault of her while there was an order of protection in place. Concerning this conviction, the Defendant asserts there was insufficient corroboration of Ms. Polk's testimony, noting that A.B. testified that the couple merely "argu[ed]." The evidence, viewed in the light most favorable to the State, shows that Ms. Polk had obtained an order of protection against the Defendant prior to this incident. The order of protection showed that it had been agreed to by the Defendant at a hearing. The order stated that, while the Defendant was permitted to have personal contact with Ms. Polk, he could not intentionally harm her, her children, or her property. On the night of this incident, the Defendant, who had been drinking, entered Ms. Polk's residence, where he no longer resided, grabbed her nightgown and became enraged that she was not wearing undergarments. He then grabbed her and attempted to strike her with his fists. She backed away from him, causing him to miss her with his fist, and he punched a wall, damaging it. This evidence supports the Defendant's conviction for aggravated assault as defined by Tennessee Code Annotated section 39-13-102(c). We find unpersuasive the Defendant's assertion that there was insufficient corroboration of Ms. Polk's testimony. The jury heard the evidence and it accredited Ms. Polk's account of the events. As previously stated, questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *See Bland*, 958 S.W.2d at 659.

In Count 3, the jury convicted the Defendant of aggravated assault for his actions of attempting to strangle A.B. with his hands. The Defendant argues that A.B. testified that the Defendant merely pushed him against the wall using his hands to A.B.'s chest. Further, there was no proof of any medical injuries to him. As previously defined, aggravated assault includes an assault where the perpetrator attempts to strangle the victim. "[S]trangulation" is defined as "impeding normal breathing or circulation of the blood by applying pressure to the throat or neck . . . ." Ms. Polk testified at trial that the Defendant grabbed A.B.'s neck and encircled it with his hands. She said that he tried to choke him for between a minute or a minute and a half while she was attempting to contact the police. A.B. testified that the Defendant put his hand under his neck, pushed him back against the wall, and held him there. This evidence is sufficient to support the Defendant's conviction for aggravated assault. The statutory elements in this count of aggravated assault do not require proof that A.B. sustained injuries for the Defendant to be convicted of aggravated assault.

7

In Count 4, the jury convicted the Defendant of attempted aggravated assault for throwing a weight at A.B., which hit his lower back and caused him pain and to vomit blood. The Defendant contends that A.B. stated that he was not in fear of his father at this time. Further, he argues that A.B. returned from the hospital after a short duration and was informed by doctors that he would be fine. During the trial, A.B. testified that he ran outside to get away from the Defendant. He said that the Defendant "caught" him and hit him in his lower back with a weight. The weight hit him with such force that he lost his breath, could not stop coughing, and vomited blood. The injury caused A.B. to have a sensation that he described as "burning real bad." The jury could have inferred that A.B. running away from the Defendant showed that he was in fear of the Defendant. The evidence supports the Defendant's conviction for the attempted aggravated assault of A.B. by hitting him with the weight.

In Count 5, the Defendant was convicted of criminal trespass. A person commits criminal trespass if the person enters or remains on property, or any portion of property, without the consent of the owner. T.C.A. § 39-14-405. The Defendant contends that the evidence does not support his conviction because, while he may not have had express permission to enter Ms. Polk's residence, by her actions she had consented to him being in her home. He states that Ms. Polk "allowed him to stay overnight on various occasions without her express authority." The evidence presented at trial included Ms. Polk's denial that the Defendant had stayed at her home overnight. The evidence did show that she knew that the Defendant went to her home and visited with their sons when she was at work. Ms. Polk testified that she did not allow the Defendant to enter her home while she was present. She said that the Defendant did not have her consent to enter her home that evening. The jury accredited Ms. Polk's testimony, and her testimony supports his conviction. The Defendant is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE

8